IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>ARTUR GEVORKYAN, GAREN AMBARTSUMYAN, and ARTHUR KOSTANYAN,<br><br>        Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:08-CR-106TC |

      Defendants Artur Gevorkyan, Garen Ambartsumyan, and Arthur Kostanyan were indicted by a grand jury on multiple counts relating to possession of counterfeit access devices, identity theft, and possession of controlled substances. Items and statements supporting the charges were obtained during a traffic stop after a trooper with the Utah Highway Patrol stopped the Defendants for a window tint violation. The trooper searched the car after receiving consent from the purported owner of the car. The search revealed controlled substances, a large number of counterfeit credit cards, and a counterfeit driver's license.

      The Defendants have filed a motion to suppress the evidence seized and statements made during the stop of the car, asserting they were obtained in violation of the Fourth Amendment. (Dkt. No. 39, 40, & 41) In their memorandums, the Defendants contend (1) they have standing to challenge the search of the car; (2) the stop was illegal at its inception; and (3) the scope of the stop exceeded permissible bounds. Because of these alleged violations of their rights, the

Defendants argue that the consent to search the car was not voluntary.

For the reasons set forth below, the Defendants' Motion to Suppress is DENIED.

## FINDINGS OF FACT

On February 2, 2008, Trooper Jared Withers of the Utah Highway Patrol observed a black Lincoln Navigator with California license plates traveling eastbound on Interstate 70. (Sept. 5, 2008 Tr. of Evidentiary Hr'g on Defs.' Mot. Suppress at 14-16) (hereinafter "Tr.")  As the car passed by, Trooper Withers could barely make out the silhouette of the driver. (Id. at 16) Based on this observation, he believed the windows were tinted beyond permissible levels under Utah law and stopped the car. (Id. at 17)

The trooper went to the front passenger side window to speak to the people inside. (Id. at 22)  Mr. Gevorkyan was driving the car.  Mr. Kostanyan was sitting in the front passenger seat and Mr. Ambartsumyan was sitting in the backseat.[1] (Id. at 23-24) Trooper Withers asked Mr. Gevorkyan for his driver's license.  Mr. Gevorkyan's response was unclear, but from the backseat Mr. Ambartsumyan told Trooper Withers that Mr. Gevorkyan had left his license in California. (Tr. at 31, 33) The trooper told the three men that they had been stopped because of the tinting on the windows.  Mr. Ambartsumyan argued that the tint was legal in California and Trooper Withers responded that the windows would not meet the California standard. (Tr. at 34; Gov. Ex. 1 at 12:13:43–12:14:15)  Mr. Ambartsumyan told the trooper that the car was his. (Tr. at 29)  Trooper Withers asked for the registration, insurance card, and Mr. Ambartsumyan's driver's license. (Tr. at 29) While checking the license and other documents at the car window,

---

[1]During the traffic stop Mr. Gevorkyan gave the name "Vladimir Grigoryan" or "Greg" and Mr. Ambartsumyan gave the name "Urik Muradyan." (Tr. at 24, 33, 36)

Trooper Withers asked some general questions about the group's travel plans. (Gov. Ex. 1 at 12:14:25–12:15:40) He also attempted to discover whether Mr. Gevorkyan had any identification at all and asked questions about the international driver's license provided by Mr. Ambartsumyan. (Tr. at 29; Gov. Ex. 3 (photocopy of the international license))

The registration listed Cab West L.L.C. as the owner of the car. (Tr. at 30) Underneath Cab West L.L.C., the name Gagik Bulanikyan was listed as the lessor. (Id. at 31; Gov. Ex. 4) Mr. Ambartsumyan told Trooper Withers that Cab West was his uncle's limousine company. (Tr. at 35; Gov. Ex. 1 at 12:16:28) The insurance card showed that the car was covered by a one-month policy and listed "Urik Muradyan," the alias Mr. Ambartsumyan gave the trooper, as the insured. (Tr. at 43)

At this point, Trooper Withers asked Mr. Gevorkyan to get out of the car and come into the patrol car so he could write a citation. (Tr. at 35; Gov. Ex. 1 at 12:16:28) In the patrol car Trooper Withers asked Mr. Gevorkyan some questions. (Gov. Ex. 1 at 12:17:11) In response, Mr. Gevorkyan told Trooper Withers that he had homes in California and Denver and he was traveling to Denver to pick up some of his belongings to take back to California. (Tr. at 37) Mr. Gevorkyan also told the trooper that Mr. Ambartsumyan was his cousin and Mr. Kostanyan was a friend. (Id. at 38) When Trooper Withers asked for Mr. Gevorkyan's name to run a license check, Mr. Gevorkyan provided him with the name "Vladimir Grigoryan" and a birth date. (Id. at 36) When Trooper Withers ran the information, he found a revoked or suspended California driver's license under that name. (Id.; Gov. Ex. 1 at 12:20:36) The trooper then began to write Mr. Gevorkyan a citation for driving on a suspended license. (Tr. at 38) While Trooper Withers was checking on Mr. Gevorkyan's driver's license and writing the citation, he continued asking

3

him questions. (Tr. at 37)

Trooper Withers also issued a warning for the excessive window tint. Before he had finished writing the citation, the trooper got out of the patrol car and went to measure the tint on the windows while Mr. Gevorkyan stayed in the patrol car. (Tr. at 40; Gov. Ex. 1 at 12:22:06) Trooper Withers checked the tint in three places and the results showed that only twenty percent of light was passing through the window. (Id. at 40-41) Under Utah law, forty-three percent of light must be able to pass through the front side window. Utah Code Ann. § 41-6A-1635.

While measuring the window tint, the trooper engaged Mr. Ambartsumyan and Mr. Kostanyan in conversation. He asked Mr. Ambartsumyan how he knew Mr. Gevorkyan. Mr. Ambartsumyan told him that he had only known Mr. Gevorkyan for about three months and they were not related. (Tr. at 42; Gov. Ex. 1 at 12:23:08) Mr. Kostanyan stated he had known Mr. Gevorkyan for a couple of years. (Gov. Ex. 1 at 12:24:27) Trooper Withers also asked Mr. Kostanyan for a driver's license. He testified that he was trying to find out whether there was a legal driver for the car because Mr. Gevorkyan was not permitted to drive.

After finishing the measurements, Trooper Withers returned to the patrol car to finish writing the citation and to check Mr. Kostanyan's driver's license. (Tr. at 44) The driver's license provided by Mr. Kostanyan also proved to be suspended. (Id.) While running the second license and finishing the citation, the trooper sought to clarify Mr. Gevorkyan's relationship with the other passengers. Mr. Gevorkyan said he had known Mr. Ambartsumyan "a long time" and Mr. Kostanyan for about ten years. (Id. at 45) Trooper Withers continued asking questions about how Mr. Gevorkyan knew the other people in the car, where they all lived, and where they were going. Trooper Withers then asked Mr. Gevorkyan whether the car contained anything illegal,

such as guns or drugs.  (Gov. Ex. 1 at 12:27:45)  Trooper Withers testified that although Mr. Gevorkyan answered no, his demeanor changed after the question and he stopped making eye contact, even after the trooper asked him to look at him.  (Tr. at 45; Gov. Ex. 1 at 12:27:56)

Trooper Withers gave Mr. Gevorkyan the citation and they both got out of the patrol car. (Gov. Ex. 1 at 12:31:05) Trooper Withers was suspicious of criminal activity at this point and planned to ask for consent to search the car.  (Tr. at 47) The trooper asked Mr. Gevorkyan to wait by the patrol car, walked over to the Lincoln Navigator, and asked Mr. Ambartsumyan to get out. (Gov. Ex. 1 at 12:32:29) While waiting for Mr. Ambartsumyan, Trooper Withers went back to Mr. Gevorkyan and once again asked if there was anything illegal in the car.  (Tr. at 48; Gov. Ex. 1 at 12:32:43)  Trooper Withers then asked Mr. Gevorkyan if he could search the car.  Mr. Gevorkyan made an inaudible response and motioned toward the car.  (Tr. at 48; Gov. Ex. 1 at 12:32:47)

Trooper Withers went back to speak with Mr. Ambartsumyan.  He explained that Mr. Gevorkyan's license was suspended and he was not to drive, but that they were "good to go." (Tr. at 49; Gov. Ex. 1 at 12:33:02) He then asked Mr. Ambartsumyan if he could ask him a few more questions and Mr. Ambartsumyan agreed.  Trooper Withers asked about contraband in the car and Mr. Ambartsumyan denied that there was anything illegal in the car.  (Tr. at 49) Trooper Withers asked for consent to search the car and Mr. Ambartsumyan agreed.  (Id.; Gov. Ex. 1 at 12:33:15) He asked all of the passengers to get out of the car and walk several feet in front of the car while he searched.  (Tr. at 49-50) During this time he had another exchange with Mr. Ambartsumyan, in which Mr. Ambartsumyan told him the car belonged to his friend's father, but could not provide the name of the owner.  (Id. at 53) There were three pieces of luggage in the

back of the car and for each piece Trooper Withers asked to whom it belonged and got that person's permission to search the bag.  (Id. at 51; Gov. Ex. 1 at 12:23:24–12:23:43)

While searching the car, Trooper Withers found numerous credit cards, some with names other than those given by the passengers, a bottle of prescription pills labeled hydrocodone not in the name of any of the passengers, a small amount of marijuana, and a driver's license with the name "Eddie Romero" and a picture of Mr. Kostanyan.  (Id. at 51-58)

The time of the stop from its inception until Mr. Ambartsumyan consented to the search was approximately twenty-one minutes.  (Gov. Ex. 1 at 12:12:50–12:33:15)

## CONCLUSIONS OF LAW

I. Standing

The government challenges the standing of the Defendants to contest the search of the car.  In considering a motion to suppress, the court must determine whether the search violated the rights of the particular defendant who seeks to exclude the resulting evidence.  Rakas v. Illinois, 439 U.S. 128, 139-140 (1978).  In making this determination, the court asks "whether the defendant manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable."  United States v. Arango, 912 F.2d 441, 445 (10th Cir. 1990).

It is well-settled that a passenger in a car does not have standing to challenge the search or seizure of the car, absent a showing of a possessory or property interest.  United States v. Lewis, 24 F.3d 79, 81 (10th Cir. 1994).  This is true even for passengers who share driving duties during a long trip.  United States v. Jefferson, 925 F.2d 1242, 1249 (10th Cir. 1991).  Furthermore, because "mere control is not sufficient to establish a protectable Fourth

Amendment privacy right," it is immaterial that a passenger with no possessory interest was driving at the time of a stop. Id.  In his memorandum in support of the motion to suppress, Mr. Kostanyan maintains that the car "was a registered limousine and the owner/rental agency had legally provided it to the defendants for use in their travels." (Def. Kostanyan's Mem. in Supp. of Summ. J. at 2) Nothing in the record supports the contention that Mr. Kostanyan had legal possession of the car.  He never asserted such an interest during the stop and has not presented the court with any evidence supporting this claim.  See Arango, 912 F.2d at 445 (holding the defendant had no standing to challenge the search of a truck where he "failed to introduce evidence that his possession of the truck was lawful").  Neither has Mr. Gevorkyan presented any evidence suggesting lawful possession of the car.  As a result, Mr. Gevorkyan and Mr. Kostanyan do not have standing to challenge the search of the car.

During the stop Mr. Ambartsumyan claimed that he had borrowed the car from its legal owner.  He also produced a temporary insurance card for the car in the name "Urik Muradyan," which was the alias he provided to Trooper Withers.  However, Mr. Ambartsumyan gave conflicting stories regarding from whom he had borrowed the car: at one point he said it was from his uncle's limousine company and at another point claiming it belonged to his friend's father.  Critically, he failed to provide the name "Gagik Bulanikyan," which was the name listed on the car's registration.  It is unlikely that Mr. Ambartsumyan has met his burden in demonstrating a valid possessory interest in the car.  However, even if he did have standing, the motion would be denied as explained below.

II. Initial Stop

The Defendants argue that the stop was illegal at its inception because it was not

supported by reasonable suspicion. All of the passengers in a car have standing to challenge the validity of the initial stop and their own detention. Brendlin v. California, 127 S. Ct. 2400, 2407 (2007). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).

The court concludes the traffic stop was supported by reasonable suspicion of a window tint violation. Trooper Withers could barely make out the profiles of the passengers and driver as the car passed. The Defendants point to Defense Exhibit A, which shows the Lincoln Navigator with its doors open, as evidence that the window tint was not so dark as to obscure the profiles of the passengers as they passed the patrol car. The court finds the photograph unconvincing. An open door would allow more light to pass through the window than a closed door with a dark interior. Furthermore, the darkness of the windows is apparent in the photograph, even with the doors open. Finally, Trooper Withers showed that his suspicions were justified when he tested the windows. The stop was supported by reasonable suspicion of an equipment violation and the stop was justified at its inception.

III. Scope

Finally, the Defendants maintain that Trooper Withers impermissibly expanded the scope of the stop beyond its permissible purpose and, as a result, violated their Fourth Amendment rights. In particular, they note the lapse of time between the initial stop and measuring the window tint, the many questions Trooper Withers asked that did not concern the window tint, and his request to search the car. The Defendants claim this questioning was not supported by

reasonable suspicion and unjustifiably extended the length of the encounter.

An officer's actions must be reasonably related to the purpose of the stop, in this case to investigate an equipment violation. See Terry v. Ohio, 392 U.S. 1, 20 (1968). In general "[a]n investigative detention usually must last no longer than necessary to effectuate the purpose of the stop." United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997). Trooper Withers behaved reasonably during the stop. The stop, although initially for a window-tint violation, quickly changed when Trooper Withers asked the driver for identification and he admitted he had been driving without a license. "A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Elliott, 107 F.3d 810, 813 (10th Cir.1997). After discovering that Mr. Gevorkyan was not carrying a driver's license, Trooper Withers was entitled to determine whether Mr. Gevorkyan even had a valid license or whether either passenger had a valid license and could legally drive the car. United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). Therefore, Trooper Withers's action between the initial stop and his check of the window tint were reasonable.

Furthermore, the questions Trooper Withers asked were reasonable and did not impermissibly exceed the scope of the stop. The Tenth Circuit has "repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001). Here, Trooper Withers asked Mr. Gevorkyan some general questions about his travel plans and his relationship with the other defendants. While performing the window tint measurement, he asked Mr. Kostanyan and Mr. Ambartsumyan similar questions. The trooper then returned to the patrol car

to check Mr. Kostanyan's license and continue writing out the citation. He engaged Mr. Gevorkyan in further conversation while completing these tasks. That Trooper Withers touched on topics unrelated to the violations is immaterial. United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) ("As long as the trooper's questioning did not extend the length of the detention . . . there is no Fourth Amendment issue with respect to the content of the questions.") Throughout the encounter Trooper Withers was diligently pursuing his investigation of the two violations and his questions did not impermissibly extend the length of the stop. See United States v. Sharpe, 470 U.S. 675, 685 (1985).

     Finally, the encounter became consensual after Trooper Withers returned the documents and told Mr. Ambartsumyan they were "good to go." As a result, the search of the car was voluntary. An encounter is consensual if a reasonable person would feel free to leave. Florida v. Bostick, 501 U.S. 429, 439 (1991). After Mr. Gevorkyan and Trooper Withers got out of the patrol car, Mr. Gevorkyan had all of the documents needed to continue on his way. Trooper Withers was justified in asking Mr. Ambartsumyan to step out of the car to explain the result of the stop. See United States v. Dennison, 410 F.3d 1203, 1211 (10th Cir. 2005) ("[A]n officer making a traffic stop may order both the driver and passengers to exit the car pending completion of the stop.") Speaking to Mr. Ambartsumyan was a reasonable way to conclude the stop as he was the only possible legal driver of the car and also purported to be the owner of the car. Although Trooper Withers asked Mr. Gevorkyan to remain at the patrol car while he spoke with Mr. Ambartsumyan, such a measure was reasonable for purposes of officer safety.

     Trooper Withers explained to Mr. Ambartsumyan that Mr. Gevorkyan was not permitted to drive, but that they were "good to go." At this moment both Mr. Gevorkyan and Mr.

Ambartsumyan should have reasonably concluded that the stop was terminated and they were free to leave. There are no indicia present that suggest this encounter was coercive. Trooper Withers did not use "a commanding or threatening manner or tone of voice, display[] a weapon, or touch[] the defendants." United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996). After Trooper Withers told Mr. Ambartsumyan they were "good to go," the encounter became consensual and the consent to search was therefore voluntary.

The Defendants suggest that because Mr. Gevorkyan did not clearly consent to the search when asked, Trooper Withers was required to end the encounter and not ask Mr. Ambartsumyan for permission to search. The facts do not support this argument. Mr. Gevorkyan's verbal response was ambiguous and not a clear denial of permission. In addition, he gestured toward the car and Mr. Ambartsumyan while making his response. Trooper Withers behaved reasonably by then going to Mr. Ambartsumyan, the purported owner of the car, and asking for permission to search.

**ORDER**

For the foregoing reasons, the motion to suppress is DENIED.

DATED this 27th day of January, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge